# WHEELING.

## POTEET v. COUNTY COMMISSIONERS.

Submitted June 18, 1887.—Decided June 29, 1887.

1. MANDAMUS.

The 15th section of chapter 5 of the Acts of 1881 provides, that the clerk of the County Court shall lay before said court at its next session after an election, wherein a vote has been taken on the re-location of a county-seat, the separate certificate of the precinct commissioners of the vote on this question at each precinct; and the law then provides: "The said court shall thereupon ascertain and declare the result of said vote and enter the same of record." HELD:

Under this law any voter of the county has a right to appear and contest the validity of these returns and ask that the court go behind them and ascertain, what was the actual legal vote cast at such election for and against such re-location, and to demand, that the evidence, which he offers on this question be heard; and, if the court refuse to permit him to be heard, he has a right to demand of said court to settle and sign a bill of exceptions setting out the refusal of the court to permit him to be heard to introduce any evidence on the question before them. If the court refuse to settle and sign such bill of exceptions, the Circuit Court may by *mandamus* compel the County Court to do so and thus perfect the record, so that the action of said Court may be reviewed on a writ of *certiorari* by the Circuit Court. (pp. 70, 77.)

2. BILL OF EXCEPTIONS.

The mode stated, in which a bill of exceptions should be settled, before it is signed. (pp. 89, 91, 94.)

3. MANDAMUS—RETURN.

The return by a court to a *mandamus nisi* to show cause, why it should not be compelled to sign a bill of exceptions, that the bill did not state the facts truly, is conclusive. (pp. 89, 93.)

4. MANDAMUS.

Where a bill of exceptions is tendered, which does not fairly state the truth of the case, it is the duty of the court with the aid of the counsel to settle the bill, and when it is settled, to sign it; and if the court refuses to do this, *mandamus* will lie to compel it to do so. (p. 89.)

5. MANDAMUS.

When such *mandamus* is asked, it is not necessary generally to

set out the bill of exceptions tendered and asked to be settled and signed. (p. 90.)

Statement of the case by GREEN, JUDGE:

J. E. Erwin and H. C. Poteet, voters, tax-payers and property-holders of the town of Barboursville, Cabell county, for themselves and all other voters, tax-payers and property-holders of such town, who would join therein, on February 11, 1887, presented their petition to the judge of the Circuit Court of Cabell county praying a writ of *mandamus* against the commissioners of the County Court of said county, viz.: George W. Hackworth, president, and Thomas A. Bias and George W. Grobe, commissioners, requiring them to do justice to the petitioners in the premises stated in the petition and settle, sign and seal a certain bill of exceptions, a copy of which was filed with the petition, and make the same a part of the record in the case, matter and proceeding to ascertain and declare the true result of the election held in said county of Cabell on the 2d day of November, 1886, of the vote then taken upon the question of removal and re-location of the court-house and county-seat from the town of Barboursville to the city of Huntington in said county. The petition is very long, but I deem it necessary to state its contents only briefly or rather its material parts.

On November 8, 1886, at a special session of said County Court the petitioners appeared and objected to returns of the election, which the officers of election at the several precincts had made to the clerk of said court, and which had by him been laid before said court, as false, and to the vote on this question as an undue election, and claimed, that a true return of the vote cast would show, that less than three fifths of the votes cast were cast for such re-location of the county-seat, and that illegal votes were fraudulently received in favor of such re-location, and assigned numerous other reasons for throwing out and not counting the votes professed to be cast at certain precincts. And on motion of the petitioners the said court after due examination and after hearing all the evidence offered by all parties rejected the vote cast at the Huntington precinct, which alone would have been sufficient to prevent at that election the re-loca-

tion of the county-seat at Huntington. But before the re-
sult of the vote on this question was declared, and while the
court was receiving other evidence in reference to the vote
at other precincts, the said court was stopped from all other
proceedings in the matter by a writ of prohibition issued by
the judge of the Circuit Court of said county. The petition
then alleges, that at a regular term of said County Court held
on January 10, 1887, the said court without the knowledge
of the petitioners made an order declaring the result of the
election in favor of re-location, and that the county-seat of
said county was thenceforth located at the city of Hunting-
ton, there being, as said court in its order declared, 1,944
votes for re-location and 832 against re-location. The pe-
tition also alleges, that the order was hastily and improvi-
dently entered and was false and fraudulent. The petition
states at length many facts to prove the fraudulent conduct
of the commissioners in making this false entry. The only
one I deem it necessary to mention is substantially as fol-
lows: On the morning of the 10th of January, 1887, the
first day of the term, the president of the court told one of
the petitioners, that the case would not be taken up till the
arrival of the petitioners' counsel, who was expected to ar-
rive and did arrive by that evening's train. Yet in violation
of this promise without the knowledge of petitioners and in
their absence the court had this order prepared by the coun-
sel of those, who favor the re-location of the county-seat,
and had it entered and without signing it adjourned to the
14th of January, though asked to suspend the decision and
declaration of the result of said election till the arrival of
said evening train.

The petition then alleges, that the court met on the 14th
of January, 1887, and before the orders of the first day were
read or signed, the petitioners appeared, by their counsel,
and asked to correct the same by entering the motion to re-
consider this entry and judgment in this election, of which
notice had been given on the first day of the court; but the
court refused, and the orders of the first day were signed, as
they had been written up by the clerk, without being read.
The motion to reconsider was then again made by the peti-
tioners' counsel, who asked that it be entered on the order-

book *nunc pro tunc;* but the court refused, the motion being resisted by the counsel, who had prepared the order asked to be reconsidered; and petitioners' counsel excepted. Petitioners' counsel then moved to set aside this order sustaining his motion by the affidavit of one of the petitioners, his own affidavit and the testimony of a witness in open court. At the request of the court this motion was reduced to writing, and the grounds, on which it was based, set forth in writing. But the court after a lengthy argument refused to enter this order or to reconsider the subject, or to consider the affidavits or evidence of the witness, who testified in open court.

To this action of the court the petitioners' counsel excepted and prepared a bill of exceptions setting out the rulings of the court on his motions, and the grounds on which said motions were based with the affidavits and evidence taken before the court to sustain said motions. This bill of exceptions the court refused to sign as well as any other bill of exceptions or to make any of these matters a matter of record, refusing at the same time to assign any reason for this refusal. The court also refused, when asked by petitioners' counsel, to point out any errors or supposed errors or omissions in the bill of exceptions prepared and tendered by the petitioners' counsel in order that, if any existed, the bill of exceptions might be amended. The said court also refused to enter on the record the petitioners' motion so made on January 14, 1887. The court would do nothing except on the 15th of January, 1887, make an order prepared by the opposing counsel simply and incorrectly stating, that J. H. Brown stated to the court, that he desired for your petitioners and others to move the court to reconsider its action of January 10th, 1887, which motion being objected to was overruled by the court, to which action the petitioners' counsel tendered a bill of exceptions, which the court refused to sign.

This bill of exceptions sets out more that twenty reasons, why the petitioners' motion to reconsider and set aside what was done on the 10th of January, 1887, should be sustained. But, while it set out, that the petitioners were prepared to prove the truth of the facts, which constituted these reasons,

and offered then to do so, their truth was avouched only by the affidavits of one of the petitioners and of his counsel and by the oral testimony of one witness before the court. I deem it unnecessary to set out all the facts, which, this bill of exceptions alleges, the petitioners offered to prove in order to sustain their motion, or all the facts stated in the said affidavits. I will content myself with stating the following, viz.: The grossest frauds and irregularities were perpetrated at the election at Huntington, so far as the vote on the re-location of the county-seat was concerned; the polls were kept open till dark, and fifty eight votes were cast after sunset, all for the re-location of the county-seat at Huntington; forty five other illegal votes, all in favor of such re-location, were received at that precinct, the names of the thirty of the persons casting these votes being given, fifteen of whom were unknown negroes non-residents of the county brought from Kentucky on election-day on a railroad train, being employees of the railroad company; between one fourth and one half of the votes cast at that precinct were entered on the poll-books not by the sworn clerk but by one who was not sworn, and who therefore could not legally keep such books; there were other irregularities on the face of the poll-books at that precinct, which, it is claimed, vitiate the entire vote; at the Cross Roads, another precinct in the county, the ballot-box was left unsealed for a considerable length of time out of sight of the voters and out of the custody of the officers of election of the precinct, so that it might readily have been tampered with by any evil disposed person; the common council of Huntington contrary to public policy by a formal resolution offered to the County Court, if the county-seat should be re-located at Huntington, to provide a court-room, jury-rooms and clerk's office, as long as the court might desire them, free of charge, and many voters to save costs and lessen taxes in this manner were induced by great exertions to vote for such re-location; there were no separate certificates of the votes on re-location made out and returned to the clerk of the court and by him submitted to the court, as the law required, but these certificates were made out on the poll-books, and the leaves, on which they were made out, were afterwards torn,

and the pool-books were thus mutilated and in some. instances the certificates, so that it became difficult to ascertain the truth as to the vote cast even as shown originally by the poll-books and certificates, as the re-counting of ballots would show to be the case at two of the precincts specified.

The affidavits state in substance, that J. H. Brown, the counsel for the petitioners, lived in Charleston ; that he was very anxious to be at Barboursville on the morning of the 10th of January, 1887, the day, on which the County Court commenced its session, before the court met, in order that he might attend to this case; that he made extraordinary efforts to be there in good time ; that he went on that day three times to the railroad depot for the purpose of getting on a train which passed Barboursville, the first time to take a train, which according to the published time-table of the company passed Charleston every day except Sunday at forty four minutes past four in the morning, and would have placed him in Barboursville long before the County Court met ; that without public notice the time-table had been so changed that this train ran on Sunday morning and not on the Monday morning which was the 10th of January, 1887; that he had been in the habit of taking this train when he attended the Cabell County Court, but to be certain he could get there by it on the said Monday morning he enquired of his sons, who, he had every reason to believe, knew, a day or two before the said Monday, if he could do so, and was told he could ; that being unable to go on the 4:44 A. M. train, he went to the depot again on the same day in time to take the 9 A. M. train, and was informed that it would not stop at Barboursville ; that he tried to get from the railroad officials an order for this train to stop at Barboursville for his accommodation, but could not get the order; that he then telegraphed to Dr. Evant, who was preparing the case, that he could not reach Barboursville before five o'clock that afternoon, as which hour he did arrive and found that the court had adjourned to the 14th of January, 1887; that Dr. Evans received his telegram and being unexpectedly called to the country to attend a patient, who required his immediate professional services, before he left, and before the court met, saw the president of the court,

who promised him, that the case would not be taken up till after his counsel arrived, if it was taken up at all on that day; that before he left, he also asked Judge McComas, when the court met, to advise it of the contents of this telegram from his counsel and ask the court to lay over the case till the arrival of said counsel; and Judge McComas testified before the Court that he did this.

This petition was verified by the petitioners; and the Judge of the Circuit Court of Cabell county upon its presentation with the copy of the draft of a bill of exceptions filed with it as a part thereof granted the *mandamus* on February 11th, 1887. The following is a copy of the order made by the Judge in vacation:

"February 11th, 1887, J. E. Erwin and H. C. Poteet for themselves and other citizens, voters, taxpayers and property holders of the town of Barboursville, willing to join with them, having presented to me, the judge of the Circuit Court of Cabell county, their petition and complaint in writing, duly verified by affidavit, and accompanied by a copy of the bill of exceptions hereinafter mentioned, wherein they complain that being interested in the right ascertainment and declaration of the true result of the election of Nov. 2d, 1886, for and against re-location of the county-seat of said county and having right to be heard before the court procuring correct returns and making such declaration, they appeared by their attorney in the County Court of Cabell county at its January term last, and moved said court to reconsider its action and set aside its order improvidently entered on the first day of the term, viz., on the 10th instant, declaring the result of said election untruly in favor of re-location and that Huntington was the county-seat of said county from and after that date; and stated the grounds of said motion and the evidence offered in support thereof, which motion the court overruled and refused to grant, and they excepted to the court's refusal and tendered their said bill of exceptions to said ruling, fairly stating the truth therein and asked the court and the commissioners thereof to settle and sign the same and make it a part of the record in the matter, which the court refused to do, whereby their rights have, as they complain, been prejudiced, and justice

denied to them in the premises, and for remedy therefor praying for a writ of *mandamus* to the said commissioners of said County Court, to-wit: Geo. W. Hackworth, president, and Thos. A. Bias and Geo. W. Grobe, requiring them or a majority of them to settle and sign their said bill of exceptions, or a copy thereof, which accompanies their petition aforesaid, upon consideration whereof, it is ordered that a writ of *mandamus nisi* be and the same is hereby awarded as prayed for returnable at the Court House thereof on the first day of the next term.

"Given under my hand as judge of the Circuit Court of Cabell county this 11th day of February, 1887.

"IRA J. McGINNIS.

"*To the Clerk of the Circuit Court of Cabell County.*

"IRA J. McG."

On Feb'y 14th, 1887, the following writ of *mandamus* was issued :

"THE STATE OF WEST VIRGINIA :

" *To Geo. W. Hackworth, President, and Thos. A. Bias and Geo. W. Grobe, Commissioners of the County Court of Cabell county, Greeting :*

"Whereas, complaint hath been made under oath to our judge of our Circuit Court of Cabell county by J. E. Erwin and H. C. Poteet for themselves and other citizens, voters, tax-payers and property holders of the town of Barboursville, willing to join with them who being interested in the right ascertainment and declaration of the true result of the election of November 2d, 1886, for and against re-location of the county-seat of said county and having right to be heard before the court charged with the duty of procuring correct returns and making such declaration, appeared by their attorney in the County Court of Cabell county at the January term last and moved said court to reconsider its action and set aside its order as improvidently entered on the first day of the term, viz. : on the 10th instant, declaring the result of said election untruly in favor of re-location, and that Huntington was the county-seat of said county from and after that date, and state the grounds of said motion and the evidence offered in support thereof, which motion the court

9

overruled and refused to grant and they excepted to the court's refusal and tendered their bill of exceptions to said refusal, fairly stating the truth therein and asked the court to settle and sign the same and make it a part of the record in the matter, which the court refused to do, whereby their rights as they complained have been prejudiced and justice denied to them in the premises, and in remedy thereof, a writ of *mandamus* hath been prayed, requiring the said commissioners to settle and sign said bill of exceptions, or a copy thereof, which accompanies said complaint. And we therefore, being willing that justice shall be done in the premises, command you in the name of the State of West Virginia that without delay, you or a majority of you as such commissioners if it be so, settle and sign said bill of exceptions, or a copy thereof, which accompanies said complaint as aforesaid, according to the form of the statute in such case made and provided or show cause why you have not done so, and how you shall have executed this our command, certify to our judge of our said Circuit Court at the Court House thereof, on the first day of the next term, returning then and there this writ : and this in no wise omit.

"Witness : T. W. Peyton, clerk of our Circuit Court of Cabell county, at the court house thereof, the 14th day of February, 1887, and in the 24th year of the State.

"  T. W. PEYTON,
"  *Clerk C. C. C. C.*"

The *mandamus nisi* and accompanying summons was served on all the defendants ; and on March 14th, 1887, they made their return as follows :

"The above named defendants for a return to the said writ of *mandamus* and in order to show cause why they did not sign the said bill of exceptions, and why they should not be compelled to do so by this court, say :

"First. That the statute, section 15 of chapter 39 of the Code of West Virginia, providing for the re-location of the county-seat, requires that the commissioners of election of each place of voting shall make out and sign a separate certificate of the result of the vote thereat on the question of such re-location, and deliver the same to the clerk of the County Court within

the same time they are required by law to deliver the certificates of the result of the election for officers held by them, and requires the clerk to lay said certificates before the County Court of the county at its next session thereafter. And the said court is required, at its next session to ascertain and declare the result of said vote, and enter the same of record.

" Second. That the next regular session of the County Court of said county and which was the first session of said court held after said election, and the return of said certificates, having jurisdiction and power to ascertain and declare the result of the vote taken in said county on the question of such re-location, met at the court house of said county on the 10th day of January, 1887, and did, in pursuance of the statute in such case made and provided, ascertain and declare the result of the said vote, to be, that more than three fifths of all the votes cast at the election upon the said question of the re-location of the county-seat of said county were cast in favor of said re-location at the city of Huntington, in said county, and did enter the same of record.

" Third. That after having so declared the result of the said vote, the said court unadvisedly, and in violation of the statute, sec. 10 of chapter 114, Code of West Va., adjourned to Friday, the 14th day of January, which was more than three days, and that the said court failed to meet for more than three consecutive days, and therefore, defendants are now advised when said court again met on said 14th day of January, it had no power or authority to set aside the said order declaring the result of said vote or to entertain a motion to that effect, or to sign a bill of exceptions, filed with the petition in this case, or any bill of exceptions whatever, in reference to said vote and declaration of the result thereof.

" Fourth. That when the said court examined the certificates returned by the commissioners of the result of said vote, and ascertained and declared the result thereof, and entered the same of record as aforesaid, their power with reference to that matter was spent, and they had no power or authority to set aside the said order so entered by them declaring the result of the said vote at any time, and especially so at the time said motion was made.

" Fifth. But even if they had the power to do so, they had the undoubted right to refuse to do so, and no appeal, writ of error or *certiorari* as an appellate proceeding lies to their said refusal complained of in the petition.

" Sixth. That these defendants did not refuse to sign a bill of exceptions which properly and truly stated the facts proved or offered to be proved by the said J. E. Erwin and H. C. Poteet, before the County Court of Cabell county on the said 14th and 15th days of January, 1887, when the said Erwin and Poteet appeared before said court as stated in the petition in this case and bill of exceptions tendered and filed therewith ; and the facts and matters stated in the said bill of exceptions as occurring at the time aforesaid are not true as therein stated.

" Seventh. The statute providing for such re-location does not contemplate, nor provide for any contest as to the re-location of a county-seat, and therefore no such contest can legally be carried on in or by the County Court, the power of said court being confined to the performance of the ministerial duty of counting the votes as shown by the certificates returned, and declaring the result of the vote and entering the same of record.

"And for these reasons these defendants declined to entertain and grant the said motion to set aside the order previously made declaring the result of said vote, and declined to make any order showing the making of said motion, and declined to sign the said bill of exceptions, all of which action on their part, they respectfully submit was proper and lawful on their part.

" Dated this 11th day of March, 1887.

" GEO. W. HACKWORTH, *Pres.*,

" GEO. W. GROBE,

" THOS. A. BIAS, *Com.*"

This return was verified by the affidavit of all the defendants ; and on March 21st, 1887, the court entered the following order :

" This day came the parties by their attorneys, and the defendants joined in the demurrer of the plaintiffs to their return to the writ of *mandamus* herein.   And on motion, the

defendants have leave to amend their sixth statement contained in the said return, which amendment is accordingly made. The defendants then moved to quash the said writ of *mandamus nisi*. And the matters of law arising upon said 'demurrer to said amended return being argued and considered by the court, the same is .overruled. And the motion of the defendants to quash said writ of *mandamus* being argued and considered, the same is also overruled. And thereupon the plaintiffs tendered pleas in writing, Nos. 1, 2, 3, 4, 5, 6, 7 and 8, to the filing of which said pleas and each of them the defendants objected, which objections being argued and considered, are sustained as to said pleas Nos. 2, 3, 5, 6, 7 and 8, and the court refused to permit the said pleas and each of them to be filed; but said objections to said pleas Nos. 1 and 4 are overruled, and said pleas are ordered to be filed, which is done.

"The said plaintiffs also filed the plea of *nul tiel* record, to which the defendants replied specially in writing, and also replies generally to said pleas No. 1 and 4, and issues are thereupon joined. And by agreement the parties waive a trial herein by jury and submit the matters of fact as well as of law to the court."

The plaintiffs excepted to the refusal of the court to permit the pleas named in this order to be filed. I do not deem it necessary to state the contents of their rejected pleas, except that they set up certain facts alleged in the bill of exceptions presented to the County Court as a replication to certain portions of this return. Issue was taken on the plea of *nul tiel record ;* and the following final order was made . by the court on March 3d, 1887 :

"This day came again the parties by their attorneys, and the evidence upon the issues joined herein being fully heard the court finds that the bill of exceptions filed with the complaint herein and referred to in said writ of *mandamus does not contain a true statement* of the evidence given before the said commissioners at the time stated therein, and that the return of the said defendants to said writ denying that said bill of exceptions contained a true statement of said evidence is true :

"And the court therefore refuses to award the peremptory

writ of *mandamus* to the said defendants to sign the said bill
of exceptions, as prayed for by the plaintiffs.   But this Court
being of the opinion that it was and is the duty of the said
commissioners to settle and sign a proper bill of exceptions
containing a true statement of the evidence and proceedings
given and had before them at the term aforesaid, a writ of
*mandamus* is awarded herein to be directed to the said com-
missioners, commanding them without delay to settle and
sign such bill of exceptions as is herein last above stated ac-
cording to the form of the statute in such case made and
provided : after giving reasonable notice to the attorneys of
the parties of the time and place they will settle and sign
said bill, returnable here on the first day of next adjourned
term of this Court.   And it is further ordered that the de-
fendants pay the costs of these proceedings to the plaintiffs,
incurred by them in the prosecution thereof, including an
attorney's fee of $10.00.

"The defendants object and except to so much of the
above order as awards the said peremptory writ of *man-
damus.*"

From this judgment a writ of error and *supersedeas* was
awarded by a judge of this Court on the petition of the de-
fendants, the commissioners of the County Court of Cabell
county.

*Simms & Enslow, Gibson & Michie* and *J. H. Ferguson*
for plaintiff in eror.

*J. H. & B. Brown* and *J. F. Brown* for defendant in
error.

GREEN, JUDGE :

The first question presented by this record is :   Have the
Circuit Courts any appellate jurisdiction over the County
Courts, when the latter have under chapter 5, section 15, of
Acts of 1881 (Warth's Code, chapter 39, section 15, pp. 255-
6,) ascertained and declared the result of a vote on the
question of the re-location of a county-seat and entered the
same of record ?   If the Circuit Courts have no appellate
jurisdiction in such case, it would of course be wrong for one
of them to issue a *mandamus* against the commissioners of

a County Court requiring them to sign any bill of exceptions proposed to be taken or tendered during such proceedings in their court. If such proceedings, when thus ended, could not be reviewed by any appellate proceedings but were final, it would be idle to compel the signing of any bill of exceptions. I will therefore first consider this question.

Our Constitution by art. VIII, sec. 12 (Warth's Am. Code, p. 25), provides: "The Circuit Court shall have the supervision and control of all proceedings before justices and other inferior tribunals by *mandamus*, prohibition and *certiorari*." In chapter 47, section 39, of Warth's Am. Code, p. 267 (chap. 5, section 47, of Acts of 1881, p. 37), it is provided, that an appeal shall lie to the Circuit Court from the final order of a County Court in certain specified cases, one of which is: "In cases of contested elections tried and determined by the County Court." But these specified cases do not include the case of the ascertainment and declaration of the result of a vote on the re-location of a county-seat. So that no appeal lies to the judgment of a County Court on this matter entered of record. But by chap. 5 of Acts of 1881, sec. 45, p. 37 (Warth's Am. Code, chap. 39, sec 45, p. 266), provides: "The Circuit Court of any county may by writ of prohibition prevent the County Court of such county from exercising any jurisdiction or authority, which is not conferred upon it by law or necessary and proper for carrying into execution the powers so conferred, and may by writ of *mandamus* enforce the performance of any legal duty of such court. But in such cases a writ of error or *supersedeas* may be granted on like principles and rules as in other cases." With reference to bills of exceptions taken before a County Court it. is provided in chap. 5, sec. 48 of Acts of 1881 (Warth's Am. Code, chap. 39, sec. 48, p. 267): "At the trial or hearing of any matter by the County Court, as to which an appeal will lie, a party may except to any opinion of the court and tender a bill of exceptions to such opinion, which, if the truth of the case be fairly stated therein, shall be signed by the commissioners holding the court or a majority of them; and the same shall be a part of the record of the case. If any commissioner refuse to sign such bill of exceptions, in case he participated in the de-

cision complained of, he may be compelled to do so by the Circuit Court of the county by *mandamus.* A party to such proceeding may avail himself of any error appearing on the record, by which he is prejudiced without excepting thereto."

By chap. 153 of the Acts of 1882, chapter 110 of the Code was amended and re-enacted; and the second section thereof as thus amended provides: " In every case matter or proceeding, in which a writ of *certiorari* might be issued, as the law heretofore has been, and in every case matter or proceeding before a County Court * * * the record or proceeding may after a judgment or final order therein * * * * be removed by writ of *certiorari* to the Circuit Court of the county, in which such judgment was rendered or order made, except in cases, where authority is or may be given * * * * to review such judgment or order on motion or on appeal, writ of error or *supersedeas* or in some manner other than *certiorari* * * * ." The third section provides: "In every case, matter or proceeding before a County Court * * *, in which a *certiorari* would lie according to the provisions of the preceding section, the majority of the commissioners composing the court * * * shall upon the request of either party in a civil case, matter or proceeding or the defendant in a criminal case, matter or proceeding certify the evidence, if any, which may have been heard, and sign bills of exceptions setting forth any rulings or orders which may not otherwise appear of record. Such certificate of evidence and bills of exceptions shall be parts of the record and as such be removed to the Circuit Court. Upon the hearing such Circuit Court shall in addition to determining such questions, as might have been determined upon a *certiorari*, as the law heretofore was, review such judgment, order or proceedings of the County Court * * * * upon the merits, determine all questions arising on the law and evidence and render such judgment or make such order upon the whole matter as law and justice may require."

These provisions of the Constitution and the acts to render the Constitution effective, if construed literally in every possible case, where the County Court had made a final order, would make such order subject to review by the Circuit Court

in the modes provided specially by statutes applicable to such case, and, if no mode of reviewing any final order of a County Court was provided by statute, such order should be reviewable by the Circuit Court by *certiorari.* But broad and comprehensive, as is the provision of the Constitution above quoted as well as the laws intended to carry it into effect, still there are cases of final orders of a County Court, which the Circuit Court can not review by *certiorari* or in any other manner, because such final orders or the proceedings, in which they were entered, are obviously not judicial in their character. It is true, that Article V of our Constitution provides: " The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others." But in apparent contradiction of this Article VIII expressly provides: " * * * The County Courts may exercise such other duties not of a judicial nature, as may be prescribed by law." As this special provision overrides the general provision in Article V, the Legislature had a right to impose on the County Courts not only judicial but also legislative and executive powers. In some cases the Legislature has exercised this right; and when it has, unless at the same time it expressly so provided, and its power to do that is very questionable, it is obvious, that the Circuit Courts can not review as appellate courts the final action of the County Courts in such matters; for the Constitution has conferred none but judicial powers upon the Circuit Courts and upon this Court. We have accordingly decided, that, where the Legislature has thought proper, as it has the right, to confer on the County Courts powers not judicial in their nature but legislative or executive, neither the Circuit Courts nor this Court can review in any manner the final orders of the County Courts in such matters. Nor can this Court review in any manner the final orders of a Circuit Court in any matter, which is not judicial in its character, where the Legislature, it may be without constitutional power, has conferred on the Circuit Courts any power not judicial in its nature.

In *McClure* v. *Maitland*, 24 W. Va. 561, this Court decided, that the proceedings provided by chapter 134 of the Acts of 1872–3 were executive in their nature not judicial

and therefore not reviewable by this Court. This act requires the commissioner of school-lands to report to the Circuit Court of his county, what lands therein belonging to the State should be sold for the benefit of the school-fund under the statute, and requires the court to direct the commissioner by an order to make the sale of such lands in the same manner in all respects as in the case of other lands directed to be sold under decree of said court, prescribing the place, time and manner of sale, the mode of collecting the purchase-money and paying the expenses to convey to the purchaser the interest of the State, and what disposition shall be made of the proceeds of the sale. The court is authorized to recommit or set aside the report of sale, and is directed to confirm the report of the sale, unless such report is excepted to, and competent evidence is offered to show, why it should be set aside.

We interpreted this act to authorize the prosecuting attorney only as representing the State to file such exceptions; and though the proceedings resembled somewhat judicial proceedings, we regarded them as administrative and *ex parte* like many orders and entries made by the County Courts in transacting the police and fiscal matters of the counties. They constitute the mode, which the State had adopted, of disposing of its lands, which might have been done by any other agency as well, as, for instance, by a land-office. Regarding them as not judicial in their nature we declined to review them, this Court having under the Constitution and laws only judicial functions. This decision has been followed in *Auvil* v. *Iaeger*, 24 W. Va. 583, and in *McClure* v. *Mauperture*, 29 W. Va. 633.

In *Railway Co.* v. *Board of Public Works*, 28 W. Va. 264, this Court decided as follows: "1. The action of the Circuit Court in supervising the decision of the Board of Public Works as to the assessment and valuation of railroad-property for taxation under the provisions of chapter 52, Acts of 1883, is merely executive and not judicial, the court acting in such cases as an appellate assessment or tax tribunal and exercising powers distinct from those belonging to it as a judicial tribunal in the legal sense of the term. 2. Under our Constitution the Supreme Court of Appeals of the State has

no power to review by writ of error or appeal the decisions or orders of inferior tribunals, officers or boards as to matters, which are simply administrative or legislative and not strictly judicial in their nature, except where such power may be expressly conferred by the Constitution." I know no instance, where such power is conferred on this Court. In that case this Court further held, that under section 94 of chapter 161 of the Acts of 1882 an appeal would not lie from a judgment of a County Court refusing to correct an assessment, where it is claimed, that the party assessed with the taxes is not chargeable therewith, though in such a case the right of appeal to the Circuit Court is expressly conferred; for in so acting the County Court was not acting judicially but simply as a supervising assessing tribunal. Its action in the matter was executive, not judicial, and therefore was not subject to be reviewed by any court. In so holding we reversed the action of our Court in *Low* v. *County Court*, 27 W. Va. 785, where jurisdiction in such cases was assumed to exist, no special attention having been given to the fact, that the judgment of the County Court was not properly speaking a judicial action but a decision of a supervising assessment board, which duty the Legislature had a right under the Constitution to impose upon the County Court. In *Brazie* v. *Cunningham*, 25 W. Va. 213, this Court held, that, when the commissioners of the County Court meet under section 21 of chapter 155 of the Acts of 1882 five days after an election under certain detailed and prescribed regulations and ascertain the result of an election in their county and make out and sign certificates stating the vote cast for each officer voted for at the election, they meet not as a County Court but as a board of canvassers, and as such they have only such powers as are specified in that act, that is, the power to examine the poll-books and certificates from the different precincts presented to them by the precinct officers of the election, the power to compel the attendance of these precinct officers or of any one else present at the election to answer under oath questions respecting the election and make such orders, as may be necessary to procure correct returns from all the precincts, and the power on the demand of a candidate to open any of the sealed packages of ballots

from any of the precincts and re-count the same;—that, while some of these limited powers required judgment and discretion, yet the duties of the commissioners, when thus assembled, were simply to make out certificates of votes cast and like those of other canvassing boards were ministerial not judicial; and, as showing that their duties were of this character, and that they should not be regarded as acting as a court, we pointed out the fact, that they kept no record of their proceedings and only signed a certificate stating the number of votes cast for each candidate in the county, and this certificate was under the act based on the returns, after they had been verified and made right, so far as they could be, by the limited powers conferred on these canvassers. They have, while so acting, no power to go beyond or behind the returns. They had no authority to strike from or add to the list of voters certified to them from the several precincts. They are not by this act authorized, as a court would be, to summon witnesses generally and to examine them in order to ascertain the real legal vote cast at the several precincts. They must take the certified returns of the precinct officers to be correct, when these returns have been examined and tested by the exercise of the limited powers conferred on them. Of course certificates given by commissioners as by other canvassing boards can not ultimately determine the right of any person to hold office. They are only *prima facie* correct, the burden being on any one, who may contest an office, to prove, that he received a majority of the legal votes cast; and ample provision is made by our statute-law for thus judicially contesting the right to hold any office conferred by the popular suffrage (Acts 1882, ch. 103, p. 304). The act provides for carrying such judicial contest before the County Court, the commissioners of which acting as canvassers granted the certificate; and the details of the mode of procedure are set out; and in the words of the statute "at the final trial of said contest the said court shall declare the true results of the election and cause the same to be entered on the records of said court." From such judgment of the County Court an appeal now lies (Acts 1881, chap. 5, sec. 47). Before the passage of this act the judgment of the County Court in such cases could be

reviewed by the Circuit Court by writ of *certiorari*, and the judgment of the Circuit Court was liable to be reviewed on writ of error by this Court. (*Dryden* v. *Swinburn*, 15 W. Va. 234.)

The controlling question in this case is :—Is the final judgment of a County Court ascertaining and declaring the result of a vote on the re-location of a county-seat a judicial act like the judgment of such court on a contested election, or a ministerial act like the decision of the commissioners of such court sitting as a board of canvassers five days after the election? If the latter, such judgment for reason we have already stated can not under our Constitution be reviewed by the Circuit Court. That portion of the statute, which provides, that the County Court shall declare the result of a vote or re-location is as follows :

"But the commissioners of election of each place of voting shall make out and sign a separate certificate of the result of such vote, and deliver the same to the clerk of the County Court within the same time they are required by law to deliver the certificates of the results of the election for officers held by them ; and the said clerk shall lay the same before the County Court at its next session thereafter. The said court shall thereupon ascertain and declare the result of said vote and enter the same of record."

It seems to me for several reasons, that the language of the statute indicates clearly, that this action of the County Court is judicial and therefore reviewable by the Circuit Court. The action is taken at a *session* of the court, whereas certificates of the election of officers are given at a special meeting of the commissioners held for the special purpose only of canvassing the votes cast at the election. Those two acts are in very strong contrast with each other. When acting as a board of canvassers of the votes cast for candidates for office, the commissioners make no record whatever of their conclusion, enter up nothing, which bears any resemblance to a judgment, on their order-book, but simply like other canvassing boards make out and sign certificates showing the vote cast in the county for each candidate. But when the County Court decides at its next session the question of the re-location of the county-seat, such court "ascer-

tains and declares the result of the vote and enters the same of record." This final judgment of the court entered on its record-book is almost exactly like the final judgment of the same court in a contested election, as is shown by section 3 of chapter 103 of the Acts of 1882. The words of the act are as follows: "At the final trial of said contest the said court shall declare the true result of such election and cause the same to be entered on the records of said court." I can not see how such an entry can be regarded in a contested election, as it certainly is, as the conclusion of a judicial investigation and a judgment of the court reviewable by the Circuit Court, and the ascertainment of the vote on re-location entered up in like manner by the same court on its record can be regarded as a mere declaration of a board of canvassers not reviewable by the Circuit Court. It will be observed in both cases, that before reaching a final conclusion and entering up a judgment the preliminary investigations, if correct results are sought, must be of the same character, that is, in both cases all legal and proper evidence must be heard in order to ascertain the number of legal votes cast in the county and how they were cast, the court in the one case regarding their certificate given by them when acting as a canvassing board as *prima facie* correct, and in the other case regarding the separate certificate given by the proper officer as *prima facie* showing the true vote on the re-location of the county-seat; and in either case the court can, if necessary, require the production of the poll-books the certificates and the ballots deposited with the clerk. Certainly these are judicial investigations and a recorded judgment based on such investigations by a County Court would certainly be reviewable by a Circuit Court. It is clear, that, if the County Court has a right to go into this thorough judicial investigation, and after that to enter its judgment on its record-book at a session of the court not held for any special purpose, such judgment must be regarded as a judicial act subject to be reviewed, as every such judgment of a County Court is by our Constitution and laws liable to be reviewed.

Now in *Welch* v. *County Court*, 29 W. Va. 63, this Court held, that such a judgment on the question of the re-location of a county-seat rendered by a County Court could be re-

viewed by the action of the Circuit Court on a writ of *certiorari* to the County Court, thus in effect deciding, that this was a proceeding before the County Court judicial in its character. In pronouncing the opinion of the Court I said :

" In ascertaining the result of the vote on the re-location of this county-seat the County Court could exercise all the powers of any other court in making any investigation with possibly an exception of the opening of the sealed ballots, which the statute-law seems to forbid except in case of contested elections, though it may be too literal a construction of the law to say, that they could not be opened by the County Court in determining the question, whether the county-seat had been by the vote of the qualified voters re-located."

These views, it seems to me, are sound. I see nothing in the statute, we are considering, to limit the powers of the County Court in this investigation.

It is contended by the counsel for the plaintiff in error, that the act confers upon the County Court simply the power to examine the certificates of the precinct-officers, add them up and enter the result in the record-book. If this is true, of course the action of the County Court is purely ministerial with no element in it of a judicial character, and the court acts merely as a canvassing board with far less power than it has, when as such a board five days after an election it makes out and signs certificates of the votes cast in the county for all candidates for office. This would present the strange anomaly that, while the certificate of the election of a constable would be only *prima facie* evidence of such election, and the court upon a contest would have to give the question a thorough investigation and determine, who had received the actual majority of the legal votes cast, and enter of record the result, thus, it might be, setting aside and destroying the certificate given by them as a canvassing board, a record of the result of an election upon the re-location of a county-seat, no matter how notorious and gross may have been the frauds committed at the polls, or how many illegal voters may have been allowed to vote for one location, or how many legal voters may have been excluded from voting against such location, or how outrageously and notoriously false may have been some of the certificates, must be regarded

as conclusive and not reviewable by the Circuit Court or in any other manner. If we would preserve a republican form of government, it is of the first importance that the will of the people should not be thus fraudulently thwarted. Whenever the law has submitted any question to a popular vote, we would expect as a matter of course, that ample means would be provided, whereby false and fraudulent certificates of persons who held the election as to the result might be set aside and disregarded, and in no case would the law make such certificate conclusive evidence of the vote cast. The continuance of a republican government depends on the purity of elections. The certificate of the commissioners, when acting as a board of canvassers are not final and conclusive in any single instance. Ample provision is made for going behind these returns and ascertaining how the legal voters have voted, when voting for any officers from a constable to the governor, yet we are called upon to decide, that the mere certificate of persons holding elections at precincts are conclusive, when the question is the re-location of a county-seat, a question which the masses of the people are much more interested in than in the person, who may have been elected to some petty office.

I am certainly disinclined to hold such to be the law, unless the Legislature has in clear language expressed this to be its will. This conclusion is claimed, because the statute conferring on the County Court at its next session after an election the authority to ascertain and declare the vote on the re-location of the county-seat has made no provision for a contest of any sort before the County Court. The same is true of the action of the County Court in many other matters, which are clearly judicial and may be reviewed by the Circuit Court; as for instance the appointment and qualification of personal representatives, of curators and guardians and the settlement of their accounts; the establishment of roads and mills, &c. All these as well as almost all other acts done by the County Court are judicial in their nature and are subject to be reviewed by the Circuit Court; yet most of them originate as *ex parte* proceedings, but any one interested though not a party to such proceedings may appear and contest them before the County Court; and such person though not per-

sonally a party to the controversy is regarded as included in the general language conferring on parties the right to have the action of the County Court reviewed. No just inference can be drawn that, the action of the County Court in ascertaining and declaring and entering of record the result of a vote on the re-location of a county-seat is not reviewable by the Circuit Court, because the proceeding is in its origin an *ex parte* proceeding and because no provision is made in the statute for contesting the truth of the returns before the County Court. Any one interested in the matter would have a right as in many other cases originally *ex parte* to appear before the County Court and contest what is proposed to be done and by the appropriate appellate proceedings have the action of the County Court reviewed by the Circuit Court. *Sayre* v. *Grimes*, H. & M. 404; *Triplett* v. *Jameson*, 2 Munf. 242; *Wingfield* v. *Crenshaw*, 3 H. & M. 245.

But it is said, this statute provides : "The clerk shall lay before the County Court at its next session after the election the separate certificates. The court shall thereupon ascertain and declare the result of said vote and enter the same of record." The counsel for the plaintiff in error would have us interpret this statute to mean, that on the returns of the election-officers from the several precincts and upon nothing else the court shall ascertain and declare the result of the vote on re-location of a county-seat. I do not so understand this language. I understand, that the proper mode of presenting this question to the County Court acting judicially is for the clerk to present to it the separate certificates of the vote at the several precincts. If they appear on their face to be correct, and no objection is made either to the certificates or to the fairness of the election in any respect, the Court would add up the vote for and against re-location and enter the result thus ascertained on its record-book. But in this as in very many other matters acted on by the County Court, which are informally presented as *ex parte* proceedings, any interested party has a right to appear and dispute the propriety of what the court would do as a matter of course; and he has a right to be heard; and the court ought to hear all legal evidence, that may be presented on the question before them ; and to its action any party has a right to object and bring it

before the Circuit Court by the proper legal proceed-ings.

While this right is conceded in other matters we are asked to hold, that it does not exist in the case before us. I regard that the right of the people to vote and have their votes fairly counted is here involved.

In *Welch* v. *County Court*, 29 W. Va. 63, an interested party was in a case like the one before us allowed to appear and make objection before the County Court. This was not only approved by this Court, but we further held that he had the right by the writ of *certiorari* to have the action of the County Court reviewed. The counsel for the defend-ants in error upon this question has referred to the following authorities : *People* v. *Van Slyke*, 4 Cow. 297 ; *People* v. *Cook*, 8 N. Y. 67 ; *People* v. *Ferguson*, 8 Cow. 102 ; *People* v. *Vail*, 20 Wend. 12 ; *People* v. *Pease*, 27 N. Y. 45 ; *Com-monwealth* v. *Commissioners*, 5 Rawle 95. I have examined such of these authorities, as I have access to, and they estab-lish the position, that the decision of the canvassers of the vote in an election is not conclusive, where a contestant in-stitutes against the occupant of the office a suit to oust him therefrom as not entitled thereto, not having been duly elected. Our statute-law, as I have quoted it, shows beyond dispute that this is the law in this State, and I have there-fore deemed it unnecessary to cite authorities from other States to establish this position.

The last case cited above seems to be more pertinent to the real question involved in this case, but it bears on it re-motely ; and as I have not access to the Pa. statute, I can not say what weight it is really entitled to. The constable was the returning officer in that case ; and Judge Rogers made some remarks, that seem to me reasonable and just and to show the spirit, which should actuate the courts in construing the law so as to prevent fraudulent returns from being operative to defeat the popular will. He says : "The constable may return whom he pleases taking care that his return is correct on its face. If this be conclusive, it is use-less to go through the mockery of an election. It would be better to give the appointment to the constable at once with-out the useless ceremony of an election. The act admits

the construction which we have given to it, nor do we per-ceive any danger in committing to the commissioners the power to examine into the illegality of such election." And I would here say, that I do not perceive any danger in the commissioners of the County Court, when in session as a court, examining into the legality of an election and ascer-taining what was the actual vote cast of those entitled to vote and how it was in fact cast, whether for or against re-location, and in so doing going behind the returns. There seem to be some stronger reasons for a thorough examina-tion by the County Court in such a case than in a contested election case. In the latter case the public might suffer some inconvenience from a prolonged investigation, as the time, when the officer should qualify, might pass during the continuance of the contest, and accordingly under our stat-ute such contest must be ended before the County Court in three months. But I see no difficulty likely to arise from permitting a contest before the County Court as to the vote on the re-location of the county-seat to be as thorough, as may be desirable. For the people would have the same conveniences pending the controversy as before, the county-seat remaining where it had always been.

The counsel for the plaintiff in error cites *Attorney-Gen-eral* v. *Barstow*, 4 Wis. 79, and *Morgan* v. *Quackenbosh*, 22 Barb. 22. The first of these cases, the only one I now have access to, decides, that the State board of canvassers in Wis-consin is required to make a statement and determination of an election from the certified statements of the county-canvassers alone; and they have no authority to hear, re-ceive or determine upon any other evidence. This is in en-tire accord with our decision in *Brazie* v. *Commissioners*, 25 W. Va. 213, and with the decisions generally. But it seems to me to be inapplicable to the action of a County Court in ascertaining and declaring the result of a vote on the re-lo-cation of a county-seat as under our law the court is then acting not as a board of canvassers but as a court judicially. There are two cases however referred to by the counsel for the plaintiff in error, which have more bearing upon the question I have been dicusssing. One of them is *Asbury* v. *Beavers*, 6 Tex. 457 (55 Am. Dec. 791). In this case a ma-

jority of the court held, that, when there had been a special authority conferred on the chief justice of the county by a private act of the Legislature, which in their judgment did not constitute this officer a judicial tribunal or an "inferior jurisdiction" within the meaning of their Constitution, and by this he was authorized to determine, which of two towns had received a majority of the votes polled for the county-seat ten days after an election held under the law to determine that question, as no mode of reviewing his decision was provided, it was a final decision, and could not be controlled by a *mandamus* to compel him to count the votes at certain precincts, which he had not counted. They say: "As to this election the statute confided to the officer a personal trust distinct from his ordinary official duties, an independent personal authority limited to one express object, and to be exercised according to the dictates of his own judgment upon the law. When he had exercised his judgment and finally disposed of the subject, his authority was *functus officio*. No mode of revising his decision was provided either by the special statute or the general law; and his decision therefore according to the authorities was final and conclusive. *Elliot* v. *Peirsol*, 1 Pick. 328–341, and the authorities cited in *Baker* v. *Crisholm*, 3 Tex. 157." Judge Hemphill dissented from this view and was of opinion, that a *mandamus* would lie to compel the chief justice to count the votes, which he had decided ought not to be counted. The majority of the court expressed the opinion, that, this being a special act conferring a personal trust on the officer, if it had been abused, the only remedy would be a special act annulling his acts and conferring the authority on another officer or tribunal; or a special act providing for the review of his decision or a special act affording any measure and means of relief, the Legislature may deem proper. This decision was rendered in 1851, and it seems to me the majority of the court were right in their views and properly based them on, as I understand they did, on the fact, that the act was a private one conferring on the chief justice a personal trust and not constituting him an "inferior jurisdiction," which could be controlled by superior courts. But I do not see what application the decision when based on these

grounds has to the case before us. The case before us has arisen under a general act. The tribunal to be controlled is the County Court, "inferior jurisdiction;" and there is no pretence that there was any personal trust imposed on Messrs. Hackworth, Grobe and Bias, who happened to be the commissioners of Cabell county, when the action complained of was taken. When the law was passed they of course were not in the contemplation of the Legislature. It was a general act and not based on any personal confidence in any special individual. Such a special act could not under our Constitution be passed by the Legislature.

The other case referred to by the counsel for the plaintiff in error on the question of the right to review the action of the County Court in this case is *People* v. *Smith*, 2 Freeman (Ill.) 177. The syllabus of the case will show its character. It is as follows: " Under the act of 1867 authorizing the people of Cass county to vote upon the removal of their county-seat the election may be contested according to the mode prescribed for the contest of elections of county-officers, which is governed by the 45th section of the election-law of 1845, and under the latter act the decision of the Circuit Court on an appeal from the justices is final and can not be reviewed by the Supreme Court; and this rule applies to the contest of the election in regard to the removal of the county-seat of Cass county under the first mentioned act. In such case, the decision of the Circuit Court being final, the judge trying the cause will not be compelled to sign a bill of exceptions in reference thereto." This decision was clearly right; and as our Court has appellate jurisdiction in *mandamus* cases, and the decision of the Circuit Court is not final, we will review it. All that this case shows is, that according to the views of the Illinois Legislature it was proper to permit the same review of the action of a County Court on a question of the re-location of a county-seat as on a contested election before the County Court. This we understand to be the view of our Legislature as shown by the Acts of the Legislature.

Upon the question, whether the judge of the Circuit Court of Cabell had the right in this case to compel the commissioners of Cabell to sign any bill of exceptions, very little need

be said. Formerly there was a diversity of opinion as to the proper remedy, when an inferior court refused to sign a bill of exception; and the Court of Appeals of Virginia never decided this question till 1878 in *Page* v. *Clopton*, 30 Gratt. 415. The whole subject is there reviewed at length; and the difficulties pointed out. The conclusion reached was, that " when a bill of exceptions is tendered, which does not fairly state the truth of the case, it is the duty of the judge with the aid of counsel to settle the bill and when settled to sign it; and if he refuses to do this, *mandamus* will compel him." I deem it unnecessary to examine the reasons and authorities on this subject. While there has been some conflict of opinion the conclusion reached in this case is supported by the great weight of authority; and it is not an open question in this State. So far as this case is concerned, is settled clearly by acts of the Legislature. Acts of 1881 chap. 5, secs. 45 and 48; Acts of 1882, chap. 153, sec. 3, which have been quoted above. These acts taken together show clearly, that, whenever in any case matter or proceeding before a County Court its decision can be reviewed by the Circuit Court in any manner by appeal or *certiorari*, the commissioners composing the court may be compelled by the Circuit Court of the county to sign bills of exceptions so as to put of record matters *ore tenus*, which are necessary to enable the Circuit Court to review the decision of the court on its merits.

It only remains to determine in this case, whether the Circuit Court erred in the decision it rendered requiring the commissioners of the County Court of Cabell to sign a bill of exceptions. The defendants below, the commissioners of the County Court of Cabell, made a return to the *mandamus nisi* and afterwards moved to quash it. This proceeding was irregular, as the *mandamus nisi* is regarded as the declaration, and a motion to quash it as a general demurrer. *Fisher* v. *Charlestown*, 17 W. Va. 596, pt. 2 syll; *Doolittle* v. *County Court*, 28 W. Va. 158, pt. 3 syll. The motion to quash should have been made before the return to the *mandamus nisi*, which is regarded as the plea of the defendants; but such irregularity will not prevent the court from quashing the *mandamus nisi*. *People* v. *Supervisors*, 14 Barb. 52. I there are any defects in this *mandamus nisi* regarded as a

common-law declaration is regarded, such as make it defective in substance, it should have been quashed by the court below.

The defects urged by the counsel for the plaintiffs in error are as follows :

1st. It does not set out the order of the County Court of Cabell made on the 1st day of January, 1887. The *mandamus nisi* says, this order declared the result of the election held on the 2d of November, 1886, for and against the re-location of the county-seat untruly in favor of re-location, and that Huntington was the county-seat from and after that date. This is the substance of the order according to its legal effect ; and no more is required by the rules of pleading.

2d. It does not set out facts showing that the order was improvidently made. It was not either necessary or proper to set out these facts in the *mandamus nisi*. The question before the Circuit Court was not whether the order of the 10th of June, 1887, was a proper order or was improvidently made, but whether a *mandamus nisi* should be issued to compel the commissioners of Cabell county to sign and settle a bill of exception, thus making the facts, which might show their order of January 10th, 1887, was improper and improvidently entered as part of the record and enable the court on a writ of *certiorari* intelligently to determine whether such order was proper or was improvidently entered.

3d and 4th. It does not show in what respect the result of the election was untruly declared and does not state the grounds of the defendants' motion to set aside the order of the 10th of January, 1887, nor the evidence which they offered to support their motion. It would have been improper to set these things out in the *mandamus nisi*. The plaintiffs in the writ claimed the right to be heard and to ask, that this order of the 10th of January, 1887, be set aside as improvidently made. No matter whether their grounds for asking this were good or bad, they had a right to have the court sign a bill of exceptions setting out the grounds of their motion and the evidence tendered to support it, in order that the Circuit Court, if the case should be carried before it by *certiorari*, might intelligently decide, whether the order should be set aside, and the plaintiffs be allowed to introduce the evidence,

whatever it was, which they had tendered.  Of course it was not proper in the writ of *mandamus* to state facts to show, that the result of the election was untruly declared in the order of the 10th of January, 1887.  No such question was before the court in these proceedings by *mandamus.*

5th.  It does not show what the bill of exceptions tendered contained.  It does state, that the bill of exceptions to the refusal of the court to set aside this order of January 10th, 1887, fairly stated the truth, and that they asked the court to settle and sign the same and make it a part of the record, which they refused to do.  It states also, that a copy of this bill of exceptions was a part of the complaint or petition filed by the plaintiffs.  The court in this *mandamus* case had nothing to do with the contents of the bill of exceptions. The question raised by the *mandamus nisi* was, whether the plaintiffs in it had a right to have their bill of exceptions, whatever may have been in it, settled and signed by the commissioners of the County Court of Cabell so as to make it a part of the record, so that in an entirely different proceeding by writ of *certiorari* the action of the County Court of Cabell might be reviewed.  There is nothing therefore in this fifth objection.

6th.  It commands the signing of a certain bill of exceptions, which is no part of the writ and not set out even by way of recital.  If this truly represents the command of the writ of *mandamus nisi*, then this objection is well founded, and the writ should have been quashed.  But does it truly represent the command of the writ?  The command was "that you settle and sign said bill of exceptions that accompanies the complaint, or show cause why you have not executed this command."  Was this a command to sign a particular bill of exceptions?  If so, the *mandamus nisi* was defective in not setting it out and instead thereof only referring to it as filed with the complaint or petition.  This is not a proper mode of stating the contents of a paper in a declaration or other common-law pleading.  But I do not understand that the command was to sign this bill of exceptions, this paper filed with the petition or complaint, but to "*settle* and sign it," and thus the contents of the paper became immaterial, as it was not asked, that it be signed, but

that it be settled and signed, which, as I understand, means something very different from the signing of the bill of exceptions presented. On this subject I can not make my views clearer than by quoting a portion of Judge Burks' opinion in *Page* v. *Clopton*, 30 Gratt. 427, which views I adopt as my own:

"A judge is required by the statute to sign a bill of exceptions only on the condition that the truth of the case be fairly stated therein. The statement in the return, not traversed, that these bills do not contain the truth of the case, must be taken as conclusively true in this proceeding. But the duty of the judge is not ended and fully discharged, when he merely refuses to sign a particular bill tendered, on the ground that the truth of the case is not fairly stated therein. He should go further. He should proceed with the aid of counsel to settle the bill and when settled to sign it. Originally it was supposed, that the judge was bound only to sign the bill, when a true case was presented to him, and when there was any objection to it, that he was not required to aid in its correction, and might therefore refuse to sign it. But the practice for a long time has been otherwise. (Pow. App. Pro., chap. 5, sec. 20, p. 224.) If the bill presented is not truthful and fair the judge should alter it and make it such, or suggest what alterations should be made, when such alterations can be made in the draft; or when necessary, he may require it to be re-drafted in accordance with such suggestions; for he is not bound to sign a bill, that is not true. (Pow. App. Pro., ch. 5, sec. 34, p. 235.) If a judge therefore refuse to sign a proper bill or proceed to settle the matter of a bill objected to, he may in either case be compelled by *mandamus* to act."

If he states in a return to a *mandamus nisi*, that the particular bill presented does not contain the truth of the case, and therefore he refused to sign it, such statement must be taken as conclusive in the proceeding by *mandamus*, as this Court decided in *Douglas* v. *Loomis*, 5 W. Va. 542, pt. 6 of syll. I would say, however, though that case was correctly decided, there is one paragraph in the opinion of Judge Berkshire, which I can not concur in; for if it be law, the writ of *mandamus* to compel a judge to sign a bill of exceptions

setting forth the truth, as he understands the facts, would be in many cases futile. What I object to may be found on page 546. " And hence the rule is, that the judge, where the charge is, that he refused to sign any bill of exceptions, is commanded in the conditional writ to sign and seal the bill of exceptions, *if it correctly set forth the facts.*" If this were the rule, the judge in almost every case would not be compelled to sign a bill of exceptions setting forth the facts according to his own understanding; for it would be impossible for counsel in many cases to draw a bill of exceptions, which would set forth every fact correctly, as it was understood by the judge or by any one else, for the reason, that in many complicated cases no two persons would agree upon what were the exact facts in every minute particular. This was, as stated by Judge Burks in the portion of his opinion, which I have quoted above, the old idea; but, as well stated by him, the practice has for a long time been otherwise. Such a practice would in most cases render useless the right of a party to take a bill of exceptions ; for in most cases he could not present it, so that the judge would be satisfied, that it stated the case correctly in every minute particular. The judge can not refuse to sign any bill in such a case, as Judge Berkshire thinks ; but he should "settle the bill and when settled sign it." Therefore if the complaint is, that if the judge will not sign any bill of exceptions, the *mandamus* would not be, as Judge Berkshire seems to think, and which might be justified by a practice long since abandoned according to Judge Burk's opinion, a command to the judge to sign the particular bill presented, if it correctly set forth the facts ; for such a command would in very many cases be futile. The command should be as in the case of *Paye* v. *Clopton*, 30 Gratt. 432, which commanded the judge on a tender by the relator of a bill of exceptions, if the truth of the case be fairly stated therein, to sign the same. But such command should not stop there, as Judge Berkshire seems to think, but there should be added as in this Virginia case the following provision : " If the truth of the case be not fairly stated therein, to proceed with the aid of counsel to settle the same and when settled to sign it." ·

When it is understood by the court below, what is meant

by settling a bill of exceptions, if the court is not corrupt, such a *mandamus* when obeyed would present the case fairly, that is, there would then be on the record all the facts, as they really occurred or were presented at the trial, as those facts were understood by the judge below; and no fact, which the exceptor regarded as material, would be omitted, though the court below might deem it immateral or impertinent; and no fact would be omitted, which the court below deemed material.

Settling a bill of exceptions, when presented by counsel, I understand to mean, that the court below takes the bill as presented, strikes from it no facts or statements, however impertinent or immaterial the court may consider them, if such statement or facts are correctly stated; and if any facts or statements are incorrectly stated, the court alters them by changing the bill of exceptions so far as to make the statements of facts correct, taking care to strike out of the bill no part of any statement or any facts further than is necessary to make it correspond accurately with the truth. If there be any statement in the bill or any facts stated, which are without any basis of truth, these and these only can properly be stricken out entirely. If necessary the court modifies such bill by adding to it any statement or fact, which it regards as material, which has been omitted from such bill. When the court has done this it is its duty to sign the bill and make it a part of the record, whenever the case matter or proceeding can be reviewed, with a single exception, and that is, when a new trial is asked in a common-law suit, and the evidence is so conflicting on material points, that the appellate court could not even consider the statement of facts, if they were certified. The court is not bound to sign any bill of exceptions setting out such conflicting evidence. *Morgan* v. *Fleming*, 24 W. Va. 187. Except in such case it is not necessary for the *mandamus nisi*, if the *mandamus* only seeks to have such bill of exceptions settled and signed, to state in any manner its contents as presented.

The return of the commissioners of the County Court of Cabell is stated at length in the statement of the case. Of the seven different grounds, why they should not be required to sign the bill of exceptions presented, all but the third and

sixth have been shown to present no reason, why they should not be compelled to sign. The third of these grounds is, that the court unadvisèdly after entering the order complained of on Monday, the 10th day of January, 1887, adjourned to Friday, the 14th of January, 1887, which was more than three days, and therefore when the court again met on the 14th it had no power or authority to set aside said order or to entertain a motion to that effect or to sign said bill of exceptions. The statute on this subject is, that if after a court is opened, it fails to sit on any day, it may nevertheless sit on any subsequent day of the term, provided there be not more than three consecutive days of such failure. Acts of 1872–3, ch. 9, sec. 10. Now the consecutive days, in which the Court failed to sit, were only the 11th, 12th and 13th of January, 1887, that is only three consecutive days; and there was not more than three days of such failure. Therefore the court had a right to sit on the 14th of January, 1887; and it was but a continuance of the term, which commenced on January 10th, and it had a perfect right to transact any business, which it could have transacted on Monday, the 10th of January, 1837. The third ground therefore in this return sets out no facts, which amount to any reason, why the commissioners of the court should not be required to sign the bill of exceptions.

The sixth ground assigned in this return is : "that the defendants did not refuse to sign a bill of exceptions, which properly and truly stated the facts proven or offered to be proven by the plaintiffs, as stated in the bill of exceptions filed with the petition ; and said facts and matters stated in said bill of exceptions are not true as therein stated." This was no answer to the allegation in the *mandamus nisi*, that the plaintiffs tendered this bill of exceptions fairly stating the truth therein and asked the court to settle and sign the same and make it a part of the record. It only answered the most immaterial part of this allegation, that they did not sign this bill, because it did not state the facts truly ; but the much more material allegation, that they refused to settle this bill of exceptions, they evaded and did not reply to at all ; and it should have been treated as confessed. As there was no ground assigned in their argumentative return, why a writ of *mandamus* should not be issued by the Cir-

cuit Court requiring them to settle and sign a bill of exceptions, a peremptory writ of *mandamus* should have been issued on the filing of their evasive return.

To show still more clearly the evasive character of this return, in the beginning of it they profess only to show cause, why they did not sign the bill of exceptions, and why they should not be compelled to do so. This they did not show; and did not pretend to show, why they refused to settle and sign the bill of exceptions. The court ought therefore at once to have ordered them to settle and sign a bill of exceptions.

The plaintiffs traversed this sixth ground and alleged, that the said bill did truly state the facts; and issue was joined upon this and tried by the court, who found for the defendants, that this bill of exceptions does not contain a true statement of the evidence given before the said commissioners at the time stated therein. We have seen, that the plaintiffs had no right to traverse this sixth ground in the return, as it was conclusive of the fact, that this bill of exceptions did not state the matters and facts truly, as they occurred. But we have seen, that this was an immaterial matter, and the demurrer to the whole return should have been sustained, and a peremptory writ of *mandamus* ordered. The peremptory writ, which was ordered, was subtantially correct; but in accordance with what has been said, it should be amended, and so amended the judgment of the Circuit Court should be affirmed; and the order entered by this Court will be as follows:

The Court having maturely considered the transcript of the record of the judgment of the Circuit Court of Cabell county, rendered on the 30th day of March, 1887, and the arguments of counsel, is of opinion for reasons stated in writing and filed with the record, that there is error in said judgment, which may be corrected in this Court. It is therefore ordered by the Court, that the said judgment of the Circuit Court of Cabell county be and the same is hereby corrected so as to read as follows: This day came again the parties, by their attorneys, and the evidence on the issues joined being fully heard, the court is of opinion, that it was the duty of the commissioners of the County Court of Cabell to

settle and sign the bill of exceptions presented to them by the plaintiffs, H. C. Poteet and J. E. Erwin, appearing by their counsel : that is to say, it was the duty of said commissioners to carefully examine the bill of exceptions, and, if they found, that the statements and facts recited in it were correctly set forth, they should have signed the same; but if they found, that any one or more of the statements contained in the bill of exceptions were incorrect, they should have corrected the same in those respects only, in which the statements were erroneous, but they should not have stricken from the bill of exceptions any statement or fact alleged in it, if the same were true, no matter how impertinent or immaterial they may have considered such statement or fact to be; and the commissioners should have added to the bill of exceptions any omitted fact or statement, which they deemed material; and having thus settled the bill, it was their duty to sign the same.

It is therefore considered, that a peremptory writ of *mandamus* be issued directed to the respondents, George W. Hackworth, Thomas A. Bias and George W. Grobe, commissioners of the County Court of Cabell county, requiring them and each of them on tender by the plaintiffs of the bill of exceptions filed with the petition for *mandamus* in this case to settle such bill of exceptions in the manner above stated and make it a part of the record of the proceedings, in which the exceptions were tendered ; or if the plaintiffs by their counsel prefer to tender another bill of exceptions to the rulings and action of the court instead of that, which accompanies their petition for *mandamus*, then the said commissioners shall settle and sign the bill in the manner hereinbefore stated and make it a part of the record of their proceedings therein. The said commissioners shall give to the attorneys of the parties reasonable notice of the time, when, and place, where they will settle and sign said bill and the writ of *mandamus* is to be returnable on the first day of the next term of the Circuit Court of Cabell county. It is further ordered, that the plaintiffs recover against the defendants their costs about their prosecution of their proceedings in this behalf in the Circuit Court of Cabell county expended including

an attorney's fee of ten dollars.   It is further considered by this Court, that the judgment of the Circuit Court of Cabell county rendered in this case on the 30th day of March, 1887, corrected and amended as above set forth, be and the same is hereby affirmed, and that the defendants in error recover against the plaintiffs in error thirty dollars damages and their costs about their defence in this Court expended.   Which is ordered to be certified forthwith to the Circuit Court of Cabell county.

AMENDED AND AFFIRMED.